**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | No. CR-13-01944-TUC-JAS (BGM) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| vs. | ) | |
| | ) | |
| Melquiades Natanael Lara-Valenzuela, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Currently pending before the Court is Defendant Melquiades Natanael Lara-Valenzuela's Motion to Suppress Statements (Doc. 50) and Motion to Suppress Evidence Resulting from Fourth Amendment Violations (Doc. 58). Defendant is charged with one count of using a facility in interstate or foreign commerce, namely a telephone, with the intent to promote, manage, establish, carry on and facilitate the promotion management, establishment and carrying on of an unlawful activity, that is extortion in violation of A.R.S. § 13-1804(1) and (2) and thereafter performed and attempted to perform an act to promote, manage, establish and carry on, and to facilitate the promotion, management establishment and carrying on of such unlawful activity, all in violation of 18 U.S.C. § 1952(a)(3), and one count of conspiring to obstruct delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in 18 U.S.C. § 1951, that is obtaining and attempting to obtain the property of L.I.P. without L.I.P.'s consent induced by the wrongful use of threatened force, violence or fear. Defendant seeks suppression of evidence obtained as a result of a stop allegedly in violation of the Fourth Amendment. The Government argues that it lawfully stopped Defendant at the international border between

1   the United States and Mexico, and the evidence was properly obtained consistent with a

2   border search, and any statements were knowingly and voluntarily made after a waiver of

3   Defendant's *Miranda* rights.

4          Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for an

5   evidentiary hearing and a report and recommendation. On August 25-26, 2014, August 29,

6   2014, November 6, 2014, November 10, 2014, and November 12, 2014 oral argument was

7   heard by Magistrate Judge Macdonald and the matter taken under advisement.  *See* Minute

8   Entry 8/25/2014 (Doc. 66); Minute Entry 8/26/2014 (Doc. 68); Minute Entry 8/29/2014

9   (Doc. 73); Minute Entry 11/6/2014 (Doc. 90); Minute Entry 11/10/2014 (Doc. 92); Minute

10  Entry 11/12/2014 (Doc. 97).  The Magistrate Judge recommends that the District Court, after

11  its independent review, deny Defendant's motion.

12

13  **I.     FACTUAL BACKGROUND**

14         ***A.     Report of Possible Kidnapping***

15         Late in the evening of October 11, 2013, Federal Bureau of Investigations ("FBI")

16  Agent Tony Taylor was contacted by Detective Gabriel Lopez from Tucson Police

17  Department ("TPD").  Hr'g Tr. 8/25/2014 (Doc. 71) 42:5-11.  Agent Taylor has been an FBI

18  agent for over sixteen (16) years.  *Id.* at 41:15-18.  He is currently assigned to the violent

19  crime and major offenders squad, and has been on that squad for a total of approximately

20  fourteen (14) years.  *Id.* at 41:19-42:1.  This was Agent Taylor's assigned squad at the time

21  of the October 13, 2013 incident.  *Id.* at 42:2-4.

22         Agent Taylor testified that Detective Lopez informed him that Luz Parra had

23  contacted TPD's office, and reported that her daughter Melissa Manzanedo was being held,

24  possibly in Mexico, and the people who were allegedly holding her were asking for money

25  in exchange for her safe return.  Hr'g Tr. 8/25/2014 (Doc. 71) 42:13-19.  Agent Taylor

26  further testified that Detective Lopez also provided more specific information about the

27  telephone calls and the telephone numbers that Ms. Parra received the calls from.  *Id.* at

28  42:20-43:7.  Agent Taylor testified that he provided Detective Lopez advice regarding

1   obtaining telephone records and possibly doing a lookout at the border through the TECS
2   system. *Id.*

3        Agent Taylor testified that he and Detective Lopez spoke more than once on the night
4   of October 11, and into October 12, 2013. *Id.* at 43:8-20. Agent Taylor further testified that
5   Detective Lopez informed him that Ms. Parra said that there was a person demanding money
6   from her. Hr'g Tr. 8/25/2014 (Doc. 71) 43:21-44:6. Agent Taylor testified that Ms. Parra
7   had informed TPD detectives that a few days prior, an individual that she knew only as
8   Veinti Ocho ("28") came to her house looking for Melissa. *Id.* at 44:7-14. Agent Taylor
9   further testified that Melissa was ultimately found at her apartment, and she went with Veinti
10  Ocho and one other individual to settle a debt. *Id.* Agent Taylor also testified that Ms. Parra
11  had informed the TPD that she had not seen her daughter, but had received numerous phone
12  calls from individuals demanding money. *Id.* at 44:19-45:1. Agent Taylor testified that Ms.
13  Parra was initially asked for $14,000.00, but said she could not come up with that kind of
14  money. *Id.* at 45:2-11. Agent Taylor testified that Ms. Parra did wire $800.00 via Western
15  Union to a number or name provided by the captors. *Id.*

16       Agent Taylor testified that according to Ms. Parra, she believed that the person
17  calling, wanting her to wire money, was Veinti Ocho – the person who had come looking for
18  Melissa and went with her to Mexico. Hr'g. Tr. 8/25/2014 (Doc. 71) 45:12-25; *see also id.*
19  at 44:7-14. Agent Taylor further testified that Detective Lopez informed him that after Ms.
20  Parra wired the money for the safe return, the individuals continued to demand additional
21  money, and threatened to begin cutting off Melissa's fingers if they did not receive it. *Id.* at
22  46:1-9; *see also id.* at 63:3-14. Agent Taylor also testified that Detective Lopez indicated
23  that Ms. Parra was concerned about her daughter's safety, because she believed that her
24  daughter was being held against her will and in serious danger. *Id.* at 46:7-13.

25       Agent Taylor testified that he suggested to Detective Lopez to make a request for an
26  exigency order from the telephone company to determine the location of the two telephones,
27  which he believed were both 520 area code telephone numbers. *Id.* at 46:14-24. Agent
28  Taylor further testified that Detective Lopez did seek an exigency order, and that the phones

were located in the Agua Prieta/Douglas area on October 11 and 12, 2013. *Id.* 46:25-47:7. Detective Taylor testified that he put Detective Lopez and TPD in contact with someone at the Douglas Police Department to see if they could get further information regarding the telephones' location information. Hr'g Tr. 8/25/2014 (Doc. 71) 47:12-48:3. Agent Taylor further testified that he also began disseminating the information to the Sierra Vista Office, to Supervisory Special Agent Dave Bodily. *Id.*; *see also id.* at 48:19-49:13. Agent Taylor also testified that he provided Supervisory SA Bodily and his border liaison officer with a summary of what Detective Lopez had given him, including the concern that if Ms. Parra did not pay, the individuals who held Melissa would begin cutting off her fingers. *Id.* at 47:12-48:3; 50:3-7; *see also* 84:12-18, 85:14-19. Agent Taylor testified that this was done both via telephone and e-mail. *Id.* at 48:4-10. Agent Taylor further testified that Supervisory SA Bodily is the group supervisor for the Sierra Vista FBI, and runs the Sierra Vista office. *Id.* at 48:15-49:13.

Agent Taylor testified that as a result of this information sharing, Agent Albert Ortiz, an FBI agent on the task force assigned to Supervisory SA Bodily, ran TECS crossings for the victim, Melissa Manzanedo, and her friend, Anel Marquez. Hr'g Tr. 8/25/2014 (Doc. 71) 50:8-52:2. Agent Taylor further testified that the TECS crossings showed crossings for Melissa, as well as Anel Marquez, and the crossings with Anel Marques showed multiple crossings with Lara-Valenzuela. *Id.* at 50:8-51:2. Agent Taylor also testified that Supervisor SA Bodily reported that Lara-Valenzuela uses the moniker Veinti Ocho. *Id.* at 50:8-52:2. Agent Taylor testified that the TECS system is used to monitor individuals going across the international border. *Id.* at 52:12-22. Agent Taylor further testified that he obtained historical telephone records for Ms. Parra via subpoena through Cox Communication. *Id.* at 53:2-8. Agent Taylor also testified that he interviewed Melissa during his investigation. *Id.* at 53:9-22, 56:19-25.

**B.    Initial Contact at the United States - Mexico Border**

On October 13, 2013, Customs and Border Protection ("CBP") Officer Armando

1   Altamirano was working at the Douglas, Arizona Port of Entry ("POE").  Hr'g Tr. 8/25/2014
2   (Doc. 71) 91:9-15.  Officer Altamirano has been a CBP officer for over five years.  *Id.* at
3   87:7-12.  He has worked at the Douglas, Arizona POE for his entire career.  *Id.* at 87:13-17.
4   Officer Altamirano described his responsibilities at the POE as including processing the
5   traffic coming into, as well as leaving, the country through the POE.  *Id.* at 18-23.  Officer
6   Altamirano described traffic to include vehicles, pedestrians, and cargo traffic.  *Id.* at 87:24-
7   88:25.  Officer Altamirano further explained that processing this traffic means checking
8   documentation or vehicles to ensure lawful entry into the United States.  *Id.*  Officer
9   Altamirano also described that checking outgoing vehicles and people involves a different
10  process than when they are trying to gain entry into the United States.  Hr'g Tr. 8/25/2014
11  (Doc. 71) 89:1-19.  Individuals leaving the United States are checked at random, whereas
12  persons or vehicles entering the country are all inspected.  *Id.*

13       Officer Altamirano testified that he was working the swing shift, 4:00 p.m. to
14  midnight, on October 13, 2013.  *Id.* at 91:9-18.  Officer Altamirano further testified that
15  although he did not have a particular assignment during the shift, on the rotation schedule he
16  was assigned to the pedestrian walkway.  *Id.* at 91:19-22.  Officer Altamirano testified that
17  he was responsible for processing traffic coming from Agua Prieta, Sonora into Douglas,
18  Arizona.  *Id.* at 91:23-92:1, 93:2-13.  Officer Altamirano further testified that when working
19  as a primary inspector in the pedestrian walkway, he is the first officer that people making
20  entry encounter, and as such he is responsible for determining an individual's admissibility.
21  Hr'g Tr. 8/25/2014 (Doc. 71) 94:10-95:4.

22       Officer Daniel Castillo of Customs and Border Protection testified that he was also
23  working at the Douglas, Arizona POE on October 13, 2013.  *Id.* at 6:8-12.  Officer Castillo
24  has been a CBP officer since December 22, 2008.  *Id.* at 6:1-3.  On October 13, 2013, Officer
25  Castillo was working the 4:00 p.m. to midnight shift, assigned to the primary lane inspection,
26  as well as secondary inspection.  *Id.* at 6:18-7:2.

27       Officer Altamirano testified that on October 13, 2014, he received a briefing via e-
28  mail and a paper copy and photograph at all the terminals regarding a lookout for an

individual regarding a possible kidnapping. *Id.* at 92:5-93:1, 93:16-94:9. Officer Altamirano

further testified that on the same day, at 5:16 p.m., a gentleman came through the pedestrian

walkway, and  gave him his legal permanent resident visa, and when Officer Altamirano

entered the information into the system, the lookout alert came up on the terminal.  Hr'g Tr.

8/25/2014 (Doc. 71) 95:5-96:11, 116:5-10, 119:17-120:15. Officer Altamirano testified that

the alert stated that the individual was "armed and dangerous." *Id.*  Officer Altamirano

further testified that this alert was broadcast across all the other terminals simultaneously.

*Id.* at 99:23-100:13. Officer Altamirano testified that when the broadcast went out, he stated

over the radio that he was code four (4), meaning that he was okay and to disregard.  *Id.* at

99:23-100:13, 121:2-15.  Officer Altamirano further testified that this was to prevent the

subject from being alarmed, and in an effort to make the crossing seem as routine as possible,

he continued asking the individual the standard questions he asks of all incoming pedestrians.

*Id.* at 96:12-25, 100:14-101:4; 120:16-122:14. Officer Altamirano testified that he asked the

individual if he was declaring anything from Mexico, and was told no.  *Id.* at 97:14-23,

121:16-122:14. Officer Altamirano further testified that he asked the individual to empty his

front pockets, and the individual complied.  Hr'g Tr. 8/25/2014 (Doc. 71) 97:14-23, 121:16-

122:14.  Officer Altamirano also testified that he had the individual empty his back pockets

and turn around to visually inspect his person.  *Id.* at 98:4-13, 121:16-122:14, 123:5-124:1.

Once the individual turned around, Officer Altamirano testified that this was his opportunity

to get a hold of him, and put handcuffs on him.  *Id.* at 98:14-20, 123:5-124:1.  Officer

Altamirano further testified that handcuffing the individual was based on the armed and

dangerous lookout, and done as a precaution.  *Id.* at 98:21-99:3.  Officer Altamirano also

testified that he did not use his weapon or show any force on the individual, and the subject

did not offer a struggle, although the subject may have been caught off guard.  *Id.* at 99:4-15.

Officer Altamirano testified that after a brief pat down of the subject, he and another officer

accompanied the subject approximately thirty (30) feet to the secondary inspection office.

*Id.* at 101:5-16, 104:1-105:4; *see also* Hr'g Tr. 8/26/2014 (Doc. 72) 22:18-23:10.  Officer

Altamirano further testified that he escorted the subject into a patdown cell, with additional

1   officers providing backup as a result of the "armed and dangerous" lookout.  Hr'g Tr.

2   8/25/2014 (Doc. 71) 102:3-103:12, 125:10-127:22.

3        Officer Altamirano testified that in the patdown cell, a more thorough search was

4   performed.  *Id.* at 104:1-107:8; *see also* Hr'g Tr. 8/26/2014 (Doc. 72) 26:16-42:10.  Officer

5   Castillo's testimony confirmed that the search took place in the detention cell of secondary.

6   Hr'g Tr. 8/25/2014 (Doc. 71) 9:7-21.  Officer Martin Mora, the Douglas Operations

7   Command Center ("DOCC") officer on duty that night, simultaneously filled out the

8   "Personal Detention Log" recording these events, times, and persons involved.  Hr'g Tr.

9   11/6/2014 (Doc. 91) 5:9-18:7.  Officer Altamirano further testified that this search included

10   emptying the subject's pockets, and removing any outer layers of clothing, belt, jewelry, and

11   shoes.  Hr'g Tr. 8/25/2014 (Doc. 71) 104:1-107:8.  Officer Altamirano also testified that

12   Officer Castillo was present to witness the patdown per protocol, and neither he or Officer

13   Castillo or any other officer performed a strip search of the subject.  *Id.* at 108:23-110:10;

14   *see also* Hr'g Tr. 8/26/2014 (Doc. 72) 52:7-53:14.  Officer Castillo testified confirming that

15   he witnessed the subject being patdown over his clothing by Officer Altamirano.  Hr'g Tr.

16   8/25/2014 (Doc. 71) 7:11-8:6, 9:24-10:1, 38:8-39:6.   Officer Castillo also testified

17   confirming that any outer layers of clothing may have been removed, but the subject was not

18   stripped of any base clothing.  *Id.* at 18:2-9, 21:4-23, 22:3-23:4, 31:23-32:4.  Officer Castillo

19   further testified that his understanding was that the patdown was performed for officer safety,

20   because the subject was identified in a lookout regarding a possible kidnapping of a United

21   States citizen, and also to ensure the health of the individual.  *Id.* at 8:9-9:6, 32:9-25.  Officer

22   Altamirano testified that this search lasted approximately eight (8) minutes, and he followed

23   department guidelines.  Hr'g Tr. 8/25/2014 (Doc. 71) 110:16-21; Hr'g Tr. 8/26/2014 (Doc.

24   72) 50:5-9.  Officer Castillo estimated that the search took approximately five (5) minutes.

25   Hr'g Tr. 8/25/2014 (Doc. 71) 9:22-23.  Officer Mora independently recorded the relevant

26   times and events in the Prisoner Detention Log and the IOIL (the TECS Incident Report

27   Log).  *See* Hr'g Tr. 11/6/2014 (Doc. 91) 5:9-38:7.  Rather than taking officer resources away

28   from the inspection lanes, Officer Mora, as the DOCC officer, was responsible for generating

reports.  *Id.* at 18:-8-20:5.  Officer Altamirano further testified that he left the subject's belongings outside of the cell, and locked him in, while another officer contacted the owning agency of the lookout.  Hr'g Tr. 8/25/2014 (Doc. 71) 112:7-113:8.

### C.    *Department of Homeland Security Contact with Defendant at the Border*

Agent Albert Ortiz, a Special Agent with the Department of Homeland Security Office of Inspector General ("DHS/OIG"), had October 12, 2013 off work.  Hr'g Tr. 8/26/2014 (Doc. 72) 58:7-60:17.  Agent Ortiz has been with DHS/OIG since 2012, and prior to that was employed by CBP as a border patrol agent for twelve (12) years.  *Id.* at 58:17-23, Hr'g Tr. 8/29/2014 (Doc. 76) 22:21-23, 24:12-16.  Agent Ortiz described DHS/OIG's priority to conduct independent investigations on programs, events, contracts, anything under the DHS umbrella, including employees, to promote the integrity of the department.  Hr'g Tr. 8/26/2014 (Doc. 72) 59:1-8.  Agent Ortiz also represents DHS/OIG on a border correction task force which includes representatives from the FBI, CBP Internal Affairs, and CBP Office of Field Operations.  *Id.* at 59:9-60:6, Hr'g Tr. 8/29/2014 (Doc. 76) 22:24-23-1.

On October 12, 2013, Agent Ortiz received an e-mail from David Bodily, a supervisor on the task force, regarding information related to a possible kidnapping in Tucson, Arizona. Hr'g Tr. 8/26/2014 (Doc. 72) 60:18-61:11.  The e-mail contained information regarding the alleged victim, as well as a moniker for a subject known as Veinti Ocho ("28").  *Id.* at 61:1-62:5.  Agent Ortiz testified that he accessed a CBP database that allows agents to account for individuals who are crossing the border, as well as identify who is traveling with whom.  *Id.* at 61:18-62:7.  Agent Ortiz further testified that he queried the alleged victim, Melissa Manzanedo, and found she had common crossings with two individuals, Anel Marquez and Melquiades Lara-Valenzuela.  *Id.* at 62:8-63:24, 67:7-68:6.  Agent Ortiz was able to associate Melissa crossing with Anel recently in time and around the time of Melissa going missing.  *Id.* at 63:9-24, 68:7-18, 163:4-9.  Further investigation of Anel Marquez showed several crossings with Lara-Valenzuela.  *Id.* at 69:12-22, 163:10-18; 164:15-20.  Agent Ortiz passed this information on to Agent Bodily.  Hr'g Tr. 8/26/2014 (Doc. 72) 64:17-65:9, 70:8-19.

1    Agent Ortiz testified that as the investigation proceeded, he learned that the moniker
2  Veinti Ocho was associated with Defendant Lara-Valenzuela. *Id.* at 72:16-20, 161:20-24.
3  Based on the information gained during the investigation, the task force decided to put out
4  a lookout at the port of entry. *Id.* at 72:21-75:14. Agent Ortiz further testified that he spoke
5  with Supervisor Lagos at the Douglas, Arizona POE and forwarded him photographs,
6  biographical information regarding Anel Marquez and Lara-Valenzuela, and that they were
7  persons of interest in the kidnapping of Melissa. *Id.*; *see also* Hr'g Tr. 8/26/2014 (Doc. 72)
8  166:8-168:17.
9    Once Defendant Lara-Valenzuela was encountered at the Douglas POE, Agent Bodily
10  contacted Agent Ortiz and asked him to respond. Hr'g Tr. 8/26/2014 (Doc. 72) 78:7-25.
11  Agent Ortiz arrived at the Douglas POE at approximately 6:00 p.m. on October 13, 2013.
12  *Id.* at 79:24-80:3. Upon arriving at the POE, Agent Ortiz testified that he grabbed a notebook
13  and something to write with, spoke with the supervisor on duty, spoke with the officer who
14  had encountered Lara-Valenzuela, and had telephone conversations with Agent Bodily and
15  Special Agent Taylor regarding procedures going forward. *Id.* at 80:4-81:22, 157:2-15; *see*
16  *also* Hr'g Tr. 8/29/2014 (Doc. 76) 39:14-40:24, 43:23-44:16. Agent Ortiz went into the
17  interview room where Defendant Lara-Valenzuela was sitting, introduced himself and made
18  clear that he was not a CBP officer. Hr'g Tr. 8/26/2014 (Doc. 72) 81:23-83:6, 84:3-9, 84:22-
19  25. Agent Ortiz testified that after asking Defendant Lara-Valenzuela his language
20  preference, Agent Ortiz explained to him, in Spanish, that he was being sought as a person
21  of interest in an investigation, and that he was not under arrest, and free to leave he chose.
22  *Id.* at 85:1-24, 86:17-87:9. Agent Ortiz testified that he reiterated to Lara-Valenzuela that
23  he was not under arrest; however, he gave him his *Miranda* rights prior to starting the
24  interview, due to the nature of the crime being investigated. *Id.* at 86:17-91:4. Agent Ortiz
25  confirmed with Lara-Valenzuela that he understood his *Miranda* rights, and proceeded with
26  the interview. Hr'g Tr. 8/26/2014 (Doc. 72) 86:17-91:4, 92:15-94:25, 208:2-209:4.
27    Agent Ortiz testified that while obtaining background information from Lara-
28  Valenzuela, Defendant stated that his friends know him as Veinti Ocho. *Id.* at 93:9-25.

1   Agent Ortiz went on to ask whether Lara-Valenzuela was familiar with Anel Marquez.  *Id.*
2   at 94:9-16.  Lara-Valenzuela responded affirmatively, and when asked by Agent Ortiz
3   whether he knew Melissa Manzanedo, Lara-Valenzuela said that he knew her through her
4   sister Imelda.  *Id.* at 94:9-96:14.  Agent Ortiz advised Lara-Valenzuela that he was looking
5   into a report that Melissa had been kidnapped from Tucson, Arizona.  *Id.* at 96:20-97:1.
6   Lara-Valenzuela expressed surprise, and then stated that Melissa could not have been
7   kidnapped, because he knew her whereabouts and that she was fine.  Hr'g Tr. 8/26/2014
8   (Doc. 72) 97:2-98:23.  Agent Ortiz informed Lara-Valenzuela that if he knew Melissa's
9   whereabouts, then they would like to speak to her, if she was not kidnapped.  *Id.* at 98:10-23.
10  Lara-Valenzuela told Agent Ortiz that Melissa was with a woman named La Doña, and that
11  he had spoken to Melissa the day before, and that she was fine.  *Id.* at 98:10-99:15.  Agent
12  Ortiz asked Lara-Valenzuela if there was a way he could get in touch with Melissa, because
13  if the allegation was unsubstantiated, then Agent Ortiz would just leave it at that.  *Id.* at
14  99:16-100:13.  Lara-Valenzuela offered to contact a woman whom Melissa was with.  *Id.* at
15  100:4-16.

16      Agent Ortiz testified that Lara-Valenzuela was allowed to access one of the phones,
17  a gray flip phone, that had been secured, and placed a call.  Hr'g Tr. 8/26/2014 (Doc. 72)
18  100:17-101:25.  Lara-Valenzuela spoke with a woman, telling her that the authorities
19  believed Melissa to have been kidnapped.  *Id.*  Agent Ortiz asked to speak with Melissa, and
20  Lara-Valenzuela gave him the telephone.  *Id.* at 101:5-102:14.  Agent Ortiz spoke to a
21  woman who identified herself as Melissa, and who stated that she was in Mexico and fine.
22  *Id.* at 102:15-104:4.  Agent Ortiz asked Melissa if she would be willing to come to the
23  Douglas POE, and she agreed.  *Id.*  Agent Ortiz handed the telephone back to Lara-
24  Valenzuela, who told whoever was on the line to bring her.  *Id.*  Agent Ortiz stepped out to
25  notify CBP officers that a female was possibly going to present herself per request at the
26  POE.  Hr'g Tr. 8/26/2014 (Doc. 72) 103:14-104:4; Hr'g Tr. 8/29/2014 (Doc. 76) 32:8-18.
27  Agent Ortiz returned to the interview room and asked Lara-Valenzuela if he knew where
28  Melissa and La Doña were, and Lara-Valenzuela responded that they were at the casino in

1   Agua Prieta together.  Hr'g Tr. 8/26/2014 (Doc. 72) 104:8-25; *see also* Hr'g Tr. 8/29/2014
2   (Doc. 76) 34:14-17.

3        Agent Ortiz testified that Melissa presented herself to the POE within approximately
4   fifteen (15) minutes of their telephone conversation.  Hr'g Tr. 8/26/2014 (Doc. 72) 105:1-
5   106:6, 106:21-107:19.   While waiting for Melissa to arrive, Agent Ortiz chatted with
6   Defendant reminding him that he was here voluntarily, and explaining that once Melissa
7   arrived, the authorities would need to speak with her, and that if their stories matched, there
8   was no reason for anyone else to remain at the port of entry.  Hr'g Tr. 8/26/2014 (Doc. 72)
9   105:1-106:20, 154:18-155:8; Hr'g Tr. 8/29/2014 (Doc. 76) 26:7-18, 54:16-57:4.  While CBP
10  officers processed Melissa, Agent Ortiz telephoned Agent Bodily to give an update.  Hr'g
11  Tr. 8/26/2014 (Doc. 72) 106:21-107:19; *see also* Hr'g Tr. 8/29/2014 (Doc. 76) 32:19-33:3.
12  Meanwhile, Defendant Lara-Valenzuela remained in the interview room.  Hr'g Tr. 8/26/2014
13  (Doc. 72) 107:20-25.

14       Agent Ortiz testified that while Agent Bodily and Special Agent Cushman of the FBI
15  interviewed Melissa, he remained making small talk with Lara-Valenzuela.  *Id.* at 108:1-
16  109:22.  Agent Ortiz further testified that after some time had passed, Lara-Valenzuela asked
17  to use the restroom, so he was taken to a holding cell that had facilities, and the door was
18  closed for privacy purposes.  Hr'g Tr. 8/26/2014 (Doc. 72) 109:4-110:19; *see also* Hr'g Tr.
19  8/29/2014 (Doc. 76) 29:24-30:9, 51:23-53:16.  Agent Ortiz testified that it was during this
20  time that Agent Bodily and Special Agent Cushman finished their interview with Melissa,
21  and the three of them met to compare statements.  Hr'g Tr. 8/26/2014 (Doc. 72) 109:4-111:3;
22  *see also* Hr'g Tr. 8/29/2014 (Doc. 76) 29:24-30:9.  At that point, the decision was made to
23  charge Lara-Valenzuela with kidnapping and extortion based on the statements that were
24  obtained from Melissa, so he was handcuffed per protocol and moved to a second building
25  in another interview room for further questioning.  Hr'g Tr. 8/26/2014 (Doc. 72) 111:4-
26  112:8.

27       Agent Ortiz testified that the second interview was headed by Special Agent
28  Cushman.  *Id.* at 111:4-16, 119:14-22.  During the second interview, Agent Ortiz explained

1  to Lara-Valenzuela that he was going to be charged with kidnapping and extortion, and that

2  they wanted to discuss some inconsistencies between his statement, and what Melissa had

3  said. *Id.* at 119:2-121:19. Special Agent Cushman was not a Spanish speaker, so Agent

4  Ortiz spoke with Lara-Valenzuela in Spanish. *Id.*; *see also* Hr'g Tr. 8/26/2014 (Doc. 72)

5  179:6-19. Agent Ortiz testified that he and Special Agent Cushman had obtained a CBP

6  Spanish language advice of rights form, and Agent Ortiz verbally explained the form to him.

7  Hr'g Tr. 8/26/2014 (Doc. 72) 121:20-126:5. Agent Ortiz further testified that Lara-

8  Valenzuela acknowledged his understanding of the form, but he refused to sign it. *Id.* Agent

9  Ortiz testified that Lara-Valenzuela expressed that he did not see the purpose of the form, as

10 he had already agreed to speak with law enforcement. *Id.*

11         Agent Ortiz testified that during the second interview, Lara-Valenzuela admitted that

12 he had not gone to Tucson, Arizona to shop, as he had originally stated, but that he had been

13 asked by his friend "Jorge" in Agua Prieta, Mexico, to travel to Tucson and locate a Melissa

14 Manzanedo. Hr'g Tr. 8/26/2014 (Doc. 72) 129:3-20, 130:25-131:4. Agent Ortiz further

15 testified that Lara-Valenzuela also referred to Jorge as "El Viejon." *Id.* at 129:21-130:20.

16 Agent Ortiz testified that Lara-Valenzuela mentioned that Melissa had an unpaid debt to

17 Jorge, for what Agent Ortiz surmised to be illegal contraband. *Id.* at 131:5-132:6, 133:12-22,

18 193:12-194:20. Agent Ortiz further testified that Lara-Valenzuela said that Melissa traveled

19 to Mexico with him in order to answer to Jorge's concerns. *Id.* at 132:7-14. Jorge directed

20 Lara-Valenzuela to drop Melissa at the pay phones near the Mexican immigration office,

21 which Lara-Valenzuela did. *Id.* at 132:20-133:11, 190:12-191:15. Agent Ortiz also testified

22 that Lara-Valenzuela understood that Melissa would not be released until the debt was paid.

23 *Id.* at 134:23-135:22, 181:10-14. Agent Ortiz further testified that Lara-Valenzuela

24 expressed that he did not feel the kidnapping and extortion charges were fair, because he was

25 not receiving any benefit, and Melissa was not in any danger or being harmed. Hr'g Tr.

26 8/26/2014 (Doc. 72) 136:6-21. Agent Ortiz also testified that Lara-Valenzuela identified La

27 Doña as Yolanda, Jorge's wife. *Id*. at 136:22-137:16. Agent Ortiz testified that the interview

28 was not confrontational at any time. *Id.* at 137:17-138:24.

1    Agent Ortiz testified that when he inventoried Lara-Valenzuela's property, he had two
2    phones, one a white cellular telephone, and the gray flip phone that he used to call for
3    Melissa. *Id.* at 139:16-140:14. Agent Ortiz further testified that Lara-Valenzuela informed
4    him that the gray phone was given to him by Jorge, and that he did not own it. *Id.* Agent
5    Ortiz testified that he sought consent to search the white telephone, which Lara-Valenzuela
6    consented to, but because he could not determine the ownership of the gray flip phone, they
7    did not seek consent to search, nor did they search the gray phone at that time. *Id.* at 140:15-
8    141:8; *see also* Hr'g Tr. 8/29/2014 (Doc. 76) 27:3-15. Agent Ortiz testified that he contacted
9    Officer Rodriguez of the Douglas Police Department to help with searching the white
10   telephone. Hr'g Tr. 8/26/2014 (Doc. 72) 141:9-23; *see also* Hr'g Tr. 8/29/2014 (Doc. 76)
11   27:3-28:17. After Officer Rodriguez responded, Lara-Valenzuela signed a consent to search
12   form and provided the access code on the consent form. Hr'g Tr. 8/26/2014 (Doc. 72) 142:6-
13   145:15; Hr'g Tr. 8/29/2014 (Doc. 76) 30:10-31:18. Defendant Rodriguez then took custody
14   of the white cellular telephone, and performed a search. Hr'g Tr. 8/26/2014 (Doc. 72)
15   145:16-146:2.

16       **D.    *Defendant Lara-Valenzuela's Testimony***

17       Defendant Lara-Valenzuela is a thirty-two (32) year old permanent resident of the
18   United States, born in Mexico. Hr'g Tr.11/6/2014 (Doc. 91) 48:2-13. He has been in the
19   United States for approximately twenty (20) years, and attended high school in Torrence,
20   California until the eleventh grade. *Id.* at 49:7-12; Hr'g Tr. 11/10/2014 (Doc. 98) 13:23-
21   14:25. Additionally, Defendant has worked in the United States doing construction, as well
22   as having managed a car dealership in Los Angeles, California. Hr'g Tr. 11/10/2014 (Doc.
23   98) 15:8-16:4. On October 13, 2013, Defendant Lara-Valenzuela arrived at the pedestrian
24   lane of the Agua Prieta, Mexico side of the Douglas POE. Hr'g Tr.11/6/2014 (Doc. 91)
25   49:17-50:4; Hr'g Tr. 11/10/2014 (Doc. 98) 17:25-18:9. Defendant Lara-Valenzuela testified
26   that his initial contact was with Agent Altamirano, who swiped his resident card, and asked
27   him some basic questions in English. Hr'g Tr.11/6/2014 (Doc. 91) 50:53:9; Hr'g Tr.
28   11/10/2014 (Doc. 98) 18:10-19:22, 20:3-5. Defendant Lara-Valenzuela further testified that

- 13 -

1   Agent Altamirano looked surprised upon swiping Defendant's resident card.   Hr'g

2   Tr.11/6/2014 (Doc. 91) 50:25-51:15.  After a few brief questions regarding where Defendant

3   was coming from and where he was going to, Agent Altamirano had Defendant empty out

4   his pockets and asked Defendant to turn around to show the agent his back pockets.  *Id.* at

5   53:10-54:4;  Hr'g Tr. 11/10/2014 (Doc. 98) 20:20-22:17.   Defendant Lara-Valenzuela

6   testified that Agent Altamirano grabbed him roughly and pushed his face into glass or a wall,

7   and handcuffed him. Hr'g Tr. 11/6/2014 (Doc. 91) 54:5-56:18. Defendant Lara-Valenzuela

8   further testified that he heard Agent Altamirano say some sort of code into the radio, and that

9   another agent assisted in escorting him away from the passenger lane.  *Id.*

10       Defendant Lara-Valenzuela testified that Agent Altamirano and the other agent

11  escorted him into a cell and searched him.  *Id.* at 57:7-65:13.  Defendant Lara-Valenzuela

12  testified that during the search, Agent Altamirano patted him down, checked his pockets,

13  removed his outer shirt leaving his undershirt, removed his belt, removed his shirt, and

14  inspected his feet.  *Id.*; Hr'g Tr. 11/10/2014 (Doc. 98) 24:10-26:11.  Defendant Lara-

15  Valenzuela further testified that he was required to remove his pants, but was allowed to

16  leave his underwear on, and Agent Altamirano proceeded to check around his testicles. Hr'g

17  Tr. 11/6/2014 (Doc. 91) 57:7-65:13. Defendant Lara-Valenzuela testified that only Agent

18  Altamirano searched him, with two other officers present.  *Id.*  Defendant Lara-Valenzuela

19  further testified that he was left in the locked cell upon completion of the search, prior to

20  further contact with other law enforcement.  *Id.* at 65:19-66:21.

21       Defendant Lara-Valenzuela testified that Agent Ortiz came to the cell in which he was

22  being held, and introduced himself. Hr'g Tr. 11/6/2014 (Doc. 91) 66:22-67:12. Defendant

23  Lara-Valenzuela further testified that Agent Ortiz then escorted him to an office and

24  handcuffed one hand to an apparatus next to the chair he was seated in.  *Id.* at 67:20-70:6.

25  Defendant Lara-Valenzuela testified that he asked Agent Ortiz why he was detained, and that

26  Agent Ortiz responded, "You know why you're here."  *Id.* at 71:8-17.  Defendant Lara-

27  Valenzuela further testified that Agent Ortiz asked whether he knew Anel, and when

28  Defendant said yes, Agent Ortiz said that he must know Melissa, to which Defendant

1   answered in the affirmative.  *Id.* at 71:18-72:7.  Defendant Lara-Valenzuela testified that

2   Agent Ortiz did not read him his *Miranda* rights, and that when Defendant asked about a

3   lawyer, Agent Ortiz told him that it would be easier if he just answered the questions, so that

4   they could finish faster, and that the agent was tired and hungry, and that his family was

5   waiting for him.  *Id.* at 71:6-7, 72:8-74:15; Hr'g Tr. 11/10/2014 (Doc. 98) 31:6-33:9.

6   Defendant Lara-Valenzuela testified that Agent Ortiz was primarily concerned with finding

7   Melissa, so Defendant offered to contact her on his white cellular telephone.  Hr'g Tr.

8   11/6/2014 (Doc. 91) 74:16-78:15; *see also* Hr'g Tr. 11/10/2014 (Doc. 98) 40:4-24.

9   Defendant Lara-Valenzuela further testified that he showed Agent Ortiz the access code for

10  the white cellular telephone.  Hr'g Tr. 11/6/2014 (Doc. 91) 77:21-78:7, 79:24-80:8.

11  Defendant Lara-Valenzuela testified that he used the white cellular telephone to call the wife

12  of his friend Jorge (aka "El Viejon"), asked if Melissa was with her, and told her that he was

13  arrested at the port of entry and the authorities believed that Melissa had been kidnapped.

14  *Id.* at 80:9-23; Hr'g Tr. 11/10/2014 (Doc. 98) 11:22-13:4, 47:9-20.  Defendant Lara-

15  Valenzuela further testified that he put the call on speaker phone, so that Agent Ortiz could

16  hear the conversation, and the woman on the other end said that Melissa was with her at the

17  casino.  Hr'g Tr. 11/6/2014 (Doc. 91) 80:24-81:9.  Defendant Lara-Valenzuela testified that

18  he asked the woman to put Melissa on the telephone, and he told her that the authorities

19  thought she was kidnapped, then gave the telephone to Agent Ortiz to speak with Melissa.

20  *Id.* at 81:10-25.  Defendant Lara-Valenzuela further testified that the conversation between

21  Agent Ortiz and Melissa took place in English, but the one thing he did understand was that

22  Agent Ortiz told Melissa that if she presented to the port of entry within fifteen (15) minutes,

23  Defendant Lara-Valenzuela would be free to leave.  *Id.* at 81:24-82:18; Hr'g Tr. 11/10/2014

24  (Doc. 98) 41:1-12.

25      Defendant Lara-Valenzuela testified that Agent Ortiz gave him cookies to eat, briefly

26  spoke with another officer in the doorway of the interview room, and then returned

27  Defendant to the patdown cell to finish eating, and where he remained locked in for most of

28  the evening.  Hr'g Tr. 11/6/2014 (Doc. 91) 82:21-84:20, 91:13-20.  Defendant Lara-

Valenzuela further testified that while he was waiting in the cell, he twice heard a woman's voice, the first time he saw Melissa arriving at the port and speaking with two agents, the second was when he heard her leaving.  *Id.* at 84:21-86:9.  Defendant Lara-Valenzuela testified that eventually, Agent Ortiz returned to the cell with a piece of paper.  *Id.* at 84:10-89:10; Hr'g Tr. 11/10/2014 (Doc. 98) 9:7-12, 42:16-22, 44:14-21.  Defendant Lara-Valenzuela further testified that Agent Ortiz asked him to sign a consent form regarding searching his white telephone, and that the piece of paper was in English, but later could not remember whether the form was in English or Spanish.  Hr'g Tr. 11/6/2014 (Doc. 91) 84:10-89:10; Hr'g Tr. 11/10/2014 (Doc. 98) 7:5-23, 44:22-45:7.    Defendant Lara-Valenzuela testified that he refused to sign the paper, assuming that they had already searched his telephone, and claimed that the signature on the Spanish language version of the form was not his.  Hr'g Tr. 11/6/2014 (Doc. 91) 84:10-89:10, Hr'g Tr. 11/10/2014 (Doc. 98) 10:23-11:18, 44:22-45:7.

Defendant Lara-Valenzuela testified that Agent Ortiz and Special Agent Cushman eventually came to the cell where he was locked up, and escorted him to a room in another building for further questioning. Hr'g Tr. 11/6/2014 (Doc. 91) 91:21-92:7. Defendant Lara-Valenzuela further testified that he was given a paper to sign, and was told he was being arrested for kidnapping and extortion, and they were going to charge him with conspiracy. *Id.* at 93:9-22. Defendant Lara-Valenzuela testified that the document was about his rights, but that neither agent asked him if he was willing to waive his rights.  *Id.* at 93:11-95:4. Defendant Lara-Valenzuela also testified that they proceeded to ask him questions.  *Id.* at 95:5-7.

## II.    ANALYSIS

Defendant asserts that his "Fifth and Sixth Amendment rights, as protected by *Miranda*, were violated[,]" and seeks suppression of his statements to both SA Ortiz and Agent Cushman.  Def.'s Mem. of Points and Authorities in Support of Def.'s Mot. to Suppress Statements (Doc. 51) at 17-19. Defendant also contests his alleged strip-search as

violative of *Terry*, and further contends that he was arrested without probable cause.  Def.'s Mem. of Points and Authorities in Support of Mot. to Suppress Evid. Resulting from Fourth Amend. Violations (Doc. 59).  Defendant also seeks suppression of the information found after a search of the two telephones.

### A.   *Fourth Amendment – Search and Seizure*

#### 1.  Border Search

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).  "The border search doctrine is a narrow exception to the Fourth Amendment prohibition against warrantless searches without probable cause." *United States v. Seljan*, 547 F.3d 993, 999 (9th Cir. 2008) (quoting *United States v. Sutter*, 340 F.3d 1022, 1025 (9th Cir. 2003)).  It is well-established that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152, 124 S.Ct. 1582, 1585, 158 L.Ed.2d 311 (2004).  "The broad contours of the scope of searches at our international borders are rooted in 'the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country.'" *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (en banc) (quoting *United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977)).  "Under this doctrine, customs officials may conduct searches at the international border to identify the illegal transportation of contraband or undeclared articles across the border." *Seljan*, 547 F.3d at 999 (citations omitted).  "[S]earches at the international border of both inbound and outbound persons or property . . . generally require neither a warrant nor individualized suspicion." *Id.* (citations omitted).

"Even at the border, [however,] individual privacy rights are not abandoned but '[b]alanced against the sovereign's interests.'" *Cotterman*, 709 F.3d at 960 (quoting *United*

1   *States v. Montoya de Hernandez*, 473 U.S. 531, 539, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985))

2   (second alteration in original).  "[T]he touchstone of the Fourth Amendment analysis remains

3   reasonableness."  *Cotterman*, 709 F.3d at 960 (citing *Montoya de Hernandez*, 473 U.S. at

4   538, 105 S.Ct. 3304).  "The reasonableness of a search or seizure depends on the totality of

5   the circumstances, including the scope and duration of the deprivation."  *Cotterman*, 709

6   F.3d at 960 (citations omitted).  "We have determined that searches involving extended

7   detention or an intrusive search of a person's body are not routine."  *United States v. Bravo*,

8   295 F.3d 1002, 1006 (9th Cir. 2002) (citations omitted).  "In those circumstances, customs

9   officials are required to have 'reasonable suspicion' to support the search."  *Id.* (citations

10  omitted).  "To make this determination, we 'must look at the totality of the circumstances of

11  [the] case to see whether the detaining officer ha[d] a particularized and objective basis for

12  suspecting legal wrong-doing.'" *Id.* at 1008 (quoting *United States v. Arvizu*, 534 U.S. 266,

13  122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002)).

14      Here, law enforcement received information leading it to suspect that Lara-

15  Valenzuela, also known by the moniker Veinti Ocho, was involved in the kidnapping and

16  transport of Melissa Manzanedo across the border from the United States to Mexico.  Hr'g

17  Tr. 8/25/2014 (Doc. 71) 43:8-46:9, 50:8-52:2, 92:5-94:9, 95:5-96:11, 99:23-100:13, 116:5-

18  10, 119:17-120:15.  Accordingly, the information was transmitted to the agents working at

19  the Douglas, Arizona POE on October 13, 2013.  *Id.*  When Lara-Valenzuela attempted to

20  cross into the United States, the agent on duty was alerted that he was possibly involved in

21  criminal activity.  *Id.* at 95:5-96:11, 99:23-100:13, 116:5-10, 119:17-120:15.  As such, Lara-

22  Valenzuela was detained, searched, and placed in an interview room until Agent Ortiz could

23  respond and interview him regarding his possible involvement with the missing Melissa.

24  This detention was properly based upon the agents suspicion that Lara-Valenzuela was

25  involved in criminal activity.  Contrary to defense counsel's argument, detention for further

26  investigation of border crimes is not limited to the smuggling of drugs or people across an

27  international border.  *See e.g.*, *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (en

28  banc) (child pornography).  Furthermore, the Court finds that the officers' testimony

- 18 -

1   regarding the scope and duration of the immediate patdown, as well as the more extensive

2   patdown, credible.  The Court further finds the Defendant's testimony was not credible

3   regarding the scope and duration of these two searches.  Therefore, based upon a totality of

4   the circumstances, the Court finds that Lara-Valenzuela's detention and the brief searches

5   of his person were proper exercises of the sovereign's power pursuant to the border search

6   doctrine.

7                              **2.  Probable Cause for Arrest**

8            "Probable cause exists if, under the totality of the circumstances known to the

9   arresting officers, a prudent person would have concluded that there was a fair probability

10   that the individual had committed a crime."  *United States v. Hernandez*, 322 F.3d 592, 596

11   (9th Cir. 2003) (citations omitted); *see also United States v. Ocampo*, 937 F.2d 485, 490 (9th

12   Cir. 1991) (reiterating the rule that a probable cause determination requires a totality of the

13   circumstances approach).  Probable cause is a "flexible, common-sense standard[.]"  *Florida*

14   *v. Harris*, – U.S. –, 133 S.Ct. 1050, 1053, 185 L.Ed.2d 61 (2013) (alterations in original)

15   (citing *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).  Further,

16   the test for probable cause is an objective test. *Terry v. Ohio*, 392 U.S. 1, 21-2, 88 S.Ct. 1868

17   (1968).    Additionally, in determining whether an arrest complies with the Fourth

18   Amendment, the collective knowledge of all the officers involved must be considered when

19   evaluating these circumstances. *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir.

20   2007).  This holds true "even if some of the information known to other officers is not

21   communicated to the arresting officer." *United States v. Butler*, 74 F.3d 916, 921 (9th Cir.

22   1996) (citations omitted).

23            The Court finds the agents and officers' testimony credible, and under the totality of

24   the circumstances, the officers had probable cause to arrest Defendant Lara-Valenzuela upon

25   learning that he knew where Melissa was in Mexico.  Law enforcement officers had reason

26   to believe that Defendant Lara-Valenzuela, Veinti Ocho, was involved in taking Melissa

27   from the United States to Mexico, and that he had contacted Melissa's mother seeking

28   payment to ensure Melissa's continued well-being.  Hr'g Tr. 8/25/2014 (Doc. 71) 44:7-14,

45:12-25, 46:1-13, 63:3-14; Hr'g Tr. 8/26/2014 (Doc. 72) 60:18-62:5, 72:16–75:14, 161:20-24.  Upon interviewing Lara-Valenzuela, Agent Ortiz was able to confirm that Defendant knew of Melissa's whereabouts in Mexico, and was able to contact her.  Hr'g Tr. 8/26/2014 (Doc. 72) 97:2-100:16.  Defense counsel's assertions to the contrary, Melissa appearing at the Douglas POE appearing to be in good health does not clear Defendant Lara-Valenzuela of any possible misdeeds regarding her transport to Mexico or attempts to secure payment for her continued safety.  The Court finds that there was probable cause to arrest Lara-Valenzuela during Agent Ortiz's initial interview.

### 3.  Property Searches

#### a. White Telephone

It is well settled law "that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854 (1973).  "[T]he Fourth and Fourteenth amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force.  For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed."  *Id.* at 228, 93 S.Ct. at 2048.

"Whether consent to search was voluntarily given is 'to be determined from the totality of all the circumstances.'"  *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2041).  "[F]ive factors are to be considered in determining the voluntariness of consent to a search[;]" however, these factors are guideposts, and should not be considered a checklist for the Court's review.  *Patayan Soriano*, 361 F.3d at 502.  The five factors are as follows: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained."  *Patayan Soriano*, 361 F.3d at 502 (quoting *United States v. Jones*, 286 F.3d 1146, 1152 (9th

1   Cir. 2002)).  "The fact that some of these factors are not established does not automatically
2   mean that consent was not voluntary."  *United States v. Castillo*, 866 F.2d 1071, 1082 (9th
3   Cir. 1988).  The Government bears "the burden of proving that the consent was, in fact,
4   freely and voluntarily given."  *Bumper v. State of North Carolina*, 391 U.S. 543, 548, 88
5   S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

6      The Court finds that based upon the totality of the circumstances, Defendant Lara-
7   Valenzuela consented to the search of the white cellular telephone.  The Government's
8   Exhibit "9" is a consent to search the white cellular telephone signed by Defendant Lara-
9   Valenzuela.  The Court finds Defendant's testimony that he did not sign the form not
10  credible. Comparison of Government's Exhibit "9" with Defendant's signature in his Exhibit
11  "O" indicates that each was signed by the same person.  The Court further finds that Agent
12  Ortiz's testimony is credible, specifically regarding advising Defendant Lara-Valenzuela of
13  his rights, and seeking consent to search the telephone.  The Court finds that there is no
14  evidence that Defendant Lara-Valenzuela was threatened, coerced or that his will was
15  overborne.  As such, the Court finds that Defendant Lara-Valenzuela freely and voluntarily
16  gave his consent for law enforcement to search the white cellular telephone.

17         **b.  Grey Cellular Telephone**

18     The Court finds Agent Ortiz's testimony credible regarding the search of the gray
19  cellular telephone.  Because Defendant Lara-Valenzuela stated that the gray phone was not
20  his, a search warrant was obtained prior to searching the gray telephone.  Accordingly, the
21  Court finds that there was no Fourth Amendment violation.

22     **B.**  ***Miranda***

23       **1.  Custody**

24     In general, "[d]etention and questioning during routine searches at the border are
25  considered reasonable within the meaning of the Fourth Amendment. *United States v. Bravo*,
26  295 F.3d 1002, 1008 (9th Cir. 2002) (citations omitted).  "The standard for determining
27  whether a person is under arrest is not simply whether a person believes that he is free to
28  leave, *see United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497

(1980), but rather whether a reasonable person would believe that he or she is being subjected to more than a 'temporary detention occasioned by border-crossing formalities.'" *United States v. Hernandez*, 322 F.3d 592, 596-97 (9th Cir. 2003) (quoting *United States v. Butler*, 249 F.3d 1094, 1100 (9th Cir. 2001)).   "Thus, whether an individual is in custody depends upon the objective circumstances of the situation, or whether 'a reasonable innocent person in such circumstances would conclude that *after brief questioning he or she would not be free to leave.*'" *Bravo*, 295 F.3d at 1010 (quoting *United States v. Montero-Camargo*, 177 F.3d 1113, 1121 (9th Cir. 1999)) (emphasis in original). The Ninth Circuit relies on a totality of the circumstances test to determine whether a border detainee was arrested of merely detained. *See Bravo*, 249 F.3d at 1010; *see also United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005). The Ninth Circuit Court of Appeals reviews "the custody determination de novo and the underlying factual findings for clear error." *Rodriguez-Preciado*, 399 F.3d at 1127.

Brief handcuffing as an individual is walked from his vehicle to the inspection station does not constitute arrest. *See, e.g., United States v. Zaragoza*, 295 F.3d 1025, 1028 (9th Cir. 2002); *Bravo*, 295 F.3d 1011-12. Moreover, Defendant Lara-Valenzuela testified that he believed once Melissa arrived at the Douglas POE, he would be free to leave. Hr'g Tr. 11/6/2014 (Doc. 91) 81:24-82:18; Hr'g Tr. 11/10/2014 (Doc. 98) 41:1-12. As such, the Court finds that Defendant Lara-Valenzuela was not in custody during his first interview with Agent Ortiz, but rather detained for questioning. The Court further finds, however, that Defendant Lara-Valenzuela was in custody for purposes of *Miranda* during the second interview with Agents Ortiz and Cushman.

### 2.  Waiver

The Defendant's "waiver of Miranda rights must be voluntary, knowing, and intelligent." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (internal citations and quotations omitted). "The prosecution bears the burden of proving by a preponderance of the evidence that a defendant knowingly and intelligently waived his *Miranda* rights." *Id.* (internal citations omitted). "To meet this burden, generally, the Government must prove

1   that, under the totality of the circumstances, the defendant was aware of the nature of the

2   right being abandoned and the consequences of such abandonment." *United States v. Crews*,

3   502 F.3d 1130, 1140 (9th Cir. 2007) (citations omitted).  "'Voluntariness of a waiver' has

4   always depended on the absence of police over-reaching, not on 'free choice' in any broader

5   sense of the word." *United States v. Younger*, 398 F.3d 1179, 1185 (9th Cir. 2005) (citations

6   omitted); *see also United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1128 (9th Cir. 2005)

7   (quoting *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc)) ("A waiver

8   is voluntary if under the totality of the circumstances, the confession was the product of a

9   free and deliberate choice rather than coercion or improper inducement"). "The prosecution[,

10   however] does not need to show that a waiver of *Miranda* rights was express." *Berghuis v.

11   Thompkins*, 560 U.S. 370, 384, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098 (2010).  As such,

12   a waiver of a Defendant's *Miranda* rights may be either express or implied. *Id.*

13       "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the

14   sense that it was the product of a free and deliberate choice rather than intimidation, coercion,

15   or deception,' and 'made with a full awareness of both the nature of the right being

16   abandoned and the consequences of the decision to abandon it.'" *Berghuis v. Thompkins*, 560

17   U.S. 370, 382-83, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (citations omitted). "As

18   a general proposition, the law can presume that an individual who, with a full understanding

19   of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate

20   choice to relinquish the protection those rights afford." *Id.* at 385, 130 S.Ct. at 2262

21   (citations omitted).   "Several factors to consider are (I) the defendant's mental capacity; (ii)

22   whether the defendant signed a written waiver; (iii) whether the defendant was advised in his

23   native tongue or had a translator; (iv) whether the defendant appeared to understand his

24   rights; (v) whether the defendant's rights were individually and repeatedly explained to him;

25   and (vi) whether the defendant had prior experience with the criminal justice system."

26   *Crews*, 502 F.3d at 1140 (citations omitted).  The constitutional validity of Defendant's

27   waiver is questionable where police conduct "deprives a defendant of knowledge essential

28   to his ability to understand the nature of his rights and the consequences of abandoning

them." *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1986). "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Id.* at 422-23, 106 S.Ct. 1141.

The Court finds Agent Ortiz's testimony credible regarding his advisement of Defendant Lara-Valenzuela of his *Miranda* rights. The evidence before the Court demonstrates that Defendant Lara-Valenzuela was told of his *Miranda* rights in Spanish, his native language, during the first interview with Agent Ortiz. Hr'g Tr. 8/26/2014 (Doc. 72) 86:17-91:4, 92:15-94:25, 208:2-209:4. Moreover, Defendant Lara-Valenzuela understood those rights. *Id.* The Court further finds that Defendant Lara-Valenzuela was told of his *Miranda* rights a second time, prior to the second interview with Agents Ortiz and Cushman, and indicated his understanding of those rights. Hr'g Tr. 8/26/2014 (Doc. 72) 121:20-126:5. There is no evidence that Defendant Lara-Valenzuela's statements were coerced.

As an initial matter, because the Court finds that Lara-Valenzuela was not in custody during the initial interview, *Miranda* does not attach; however, even if the Court were to find that he was in custody, the Court finds that Lara-Valenzuela was properly advised of his *Miranda* rights prior to the interview and knowingly waived them. The Court further finds that Defendant Lara-Valenzuela was properly advised of his *Miranda* rights prior to the second interview, and knowingly and voluntarily waived those rights.

## III.    CONCLUSION

Defendant Lara-Valenzuela's detention and the search of his person at the United States-Mexico international border was proper as a border search. Furthermore, there was probable cause to arrest Defendant Lara-Valenzuela during his initial interview with Agent Ortiz. Defendant Lara-Valenzuela was not in custody for purposes of *Miranda* during his initial interview with Agent Ortiz; however, he was given his *Miranda* rights prior to both the initial interview with Agent Ortiz and second interview with Agents Ortiz and Cushman.

Furthermore, Defendant Lara-Valenzuela knowingly waived his *Miranda* rights in speaking with the agents.  Finally, Defendant Lara-Valenzuela consented to the search of the white cellular telephone, and a valid search warrant was obtained for the search of the gray phone. Accordingly, there were no Fourth, Fifth, or Sixth Amendment violations as alleged by Defendant Lara-Valenzuela.

## IV.    RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court DENY Defendant Melquiades Natanael Lara-Valenzuela's Motion to Suppress Statements (Doc. 50) and Motion to Suppress Evidence Resulting from Fourth Amendment Violations (Doc. 58).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.  No reply shall be filed unless leave is granted from the District Court.  If objections are filed, the parties should use the following case number: **CR-13-01944-TUC-JAS**.

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review.

DATED this 27th day of December, 2014.

Bruce G. Macdonald
United States Magistrate Judge